**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| LAND AND BAY GAUGING, LLC, 5302 | § | |
| MANDELL PROPERTY, LP, 5302 | § | |
| MANDELL PROPERTY I LLC, BNP | § | |
| NETWORKS, LLC; 500 N. WATER STREET | § | |
| PROPERTY I, LLC (also known as 500 N. | § | |
| Water Street Property, LLC), 500 N. WATER | § | |
| ST. PROPERTY LP, 5262 STAPLES LTD., | § | |
| 5262 STAPLES GP LLC, 5262 STAPLES II | § | |
| LTD., 5262 STAPLES GP II LLC, BISTRO CP | § | |
| LLC, Black COMMERCIAL HOLDINGS, | § | |
| LLC, BLACK ENERGY RESOURCES CO., | § | |
| BNP EXPLORATION CO., CCEX LLC, | § | |
| INTREPID OIL AND GAS CORP., RPH | § | |
| FINANCIAL INVESTMENTS CORP., HBP | § | |
| LTD (also known as HBP Partners, Ltd.). | § | |
| BNP COMMERCIAL PROPERTIES, LTD, | § | |
| BNP HOLDINGS, LTD, BNP HOLDINGS | § | CIVIL ACTION NO._____ |
| III, LTD, TSE EQUITIES I, LLC, TSE | § | |
| EQUITIES COMPANY, LTD, PBF | § | JURY DEMAND |
| INVESTMENTS, LTD, PAGENERGY CO, | § | |
| LLC, BNP MANAGEMENT, LLC, and | § | |
| WENDY BENNETT BLACK, | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| TOBY SHOR, INDIVIDUALLY AND AS | § | |
| TRUSTEE SEASHORE INVESTMENTS | § | |
| MANAGEMENT TRUST, TOBY SHOR AS | § | |
| TRUSTEE OF THE TOBY SHOR 2004 GRAT | § | |
| TRUST, RICHARD DALY, AND DOUGLAS | § | |
| ALLISON, | § | |
| | § | |
| Defendants. | § | |

---

## PLAINTIFFS' COMPLAINT FOR DAMAGES

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs Land and Bay Gauging, LLC, 5302 Mandell Property, LP, 5302 Mandell Property I LLC, BNP Networks, LLC, 500 N. Water Street Property I, LLC (also known as 500 N. Water Street Property, LLC), 500 N. Water St. Property LP, 5262 Staples Ltd., 5262 Staples GP LLC 5262 Staples II Ltd., 5262 Staples GP II LLC, Bistro CP LLC, Black Commercial Holdings, LLC, Black Energy Resources Co., BNP Exploration Co., CCEX LLC, Intrepid Oil and Gas Corp., RPH Financial Investments Corp., HBP Ltd. (also known as HBP Partners, Ltd.), BNP Commercial Properties, Ltd., BNP Holdings, Ltd., BNP Holdings III, Ltd., TSE Equities I, LLC, TSE Equities Company, Ltd., PBF Investments, Ltd., Pagenergy Co., LLC, BNP Management LLC, and Wendy Bennett Black  (collectively "Plaintiffs" or "Plaintiff Subject Companies") file this Original Complaint against Defendants Toby Shor ("Shor"), Individually and as Trustee for Seashore Investments Management Trust ("SIMT"), Toby Shor as Trustee of the Toby Shor 2004 GRAT Trust ("GRAT") ( Shor, SIMT and GRAT are sometimes herein collectively called the "Shor Parties"), Richard Daly ("Daly"; Daly and the Shor Parties are herein sometimes collectively called the "Shor Defendants") and Douglas Allison ("Allison") (the Shor Parties, Daly and Allison are herein sometimes collectively called the "Defendants"), and would show the Court as follows:

## I.
## INTRODUCTION

1.      This is a case of official corruption and the civil conspiracy that implemented the wrongful and illegal conduct that has deprived Plaintiffs of their property and rights without due process of law.  Plaintiffs' procedural and substantive due process rights have been repeatedly violated.  Paul Black was a judgment debtor, and through improper conduct discussed below in executing on that judgment, Plaintiffs—independent and distinct entities in which Paul Black owned an ownership, often indirectly, were seized by Defendants.   A member of the judiciary of

Nueces County, Texas, in conspiracy with the private party Defendants herein named, has wrongfully taken Plaintiffs' property and conveyed it to Paul Black's creditors without notice, hearing or a legal basis; condoned the destruction of Plaintiffs' property while in the creditors' hands; wrongfully conveyed Plaintiffs' property from creditors to the Sheriff of Nueces County without a legal basis; conducted clandestine meetings with adverse parties and "influence peddlers," where the fate and property interests of Plaintiffs were decided; issued fraudulent "orders"; and falsified and then destroyed official court records. Before retiring from the bench to a lucrative plaintiff's practice in Corpus Christi, a former Nueces County judge conspired to benefit friends and benefactors by doing the foregoing. Throughout all of this, Black's chief creditors (the Shor Parties) and their attorney (Daly), have conspired with a judicial "influence peddler" (Allison) to achieve their goals of this conspiracy. Plaintiffs turn now to the federal courts for protection and vindication.

## II.
## NOTICE OF RELATED PENDING CASE

2.      Paul Black has already filed a federal lawsuit in this same Court raising the same claims regarding the same facts. *See Paul Black v. Toby Shor, et al*, Civil Action No. 2:12-cv-0255 in the United States District Court for the Southern District of Texas, McAllen Division. Hon. Micaela Alvarez entered an order abating that case pending resolution of related appeals of various improper turnover orders in Texas state court. The Corpus Christi Court of Appeals has now reversed and vacated all of the turnover orders, and the mandate has now issued from the court of appeals as no further review was sought from the Texas Supreme Court by any of the parties who wrongfully procured the issuance of the turnover orders in the first place. *See Black v. Shor*, --- S.W.3d ----, 2013 WL 1687538 (Tex. App.–Corpus Christi April 18, 2013, no pet.).

3.      A result of the vacatur of the turnover orders is that the effect of the illicit orders in transferring title and ownership to assets and entities is no longer in effect.  Thus, just as Paul Black has a claim for damages for the assets that were wrongfully seized by these Defendants in the other lawsuit, this complaint is brought by the companies and businesses who were taken over and whose assets and interests were seized improperly by the Shor Parties and through the actions of Defendants.  The mandate has recently issued, just now giving effect to the judgment vacating the turnover orders, and this Complaint is now filed on behalf of the affected Plaintiff Subject Companies who were unlawfully taken over and damaged by Defendants.

### III
### THE PARTIES

4.      Plaintiff Land and Bay Gauging, LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

5.      Plaintiff 5302 Mandell Property LP is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

6.      Plaintiff 5302 Mandell Property I LLC is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

7.      Plaintiff BNP Networks, LLC is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

8.      Plaintiff 500 N. Water Street Property I, LLC (also known as 500 N. Water Street Property, LLC) is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

9.      Plaintiff 500 N. Water St. Property LP is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

10.     Plaintiff 5262 Staples Ltd. is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

11.     Plaintiff 5262 Staples GP LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

12.     Plaintiff 5262 Staples II Ltd. is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

13.     Plaintiff 5262 Staples GP II LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

14.     Plaintiff Bistro CP LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

15.     Plaintiff Black Commercial Holdings, LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

16.     Plaintiff Black Energy Resources Co. is a Texas corporation with its principal place of business in Corpus Christi, Texas.

17.     Plaintiff BNP Exploration Co. is a Texas corporation with its principal place of business in Corpus Christi, Texas.

18.     Plaintiff CCEX LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

19.     Plaintiff Intrepid Oil and Gas Corp. is a is a Texas corporation with its principal place of business in Corpus Christi, Texas.

20.     Plaintiff RPH Financial Investments Corp. is a is a Texas corporation with its principal place of business in Corpus Christi, Texas.

21.     Plaintiff HBP Ltd.(also known as HBP Partners, Ltd.) is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

22.     Plaintiff BNP Commercial Properties, Ltd. is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

23.     Plaintiff BNP Holdings, Ltd. is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

24.     Plaintiff BNP Holdings III, Ltd. is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

25.     Plaintiff TSE Equities I, LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

26.     Plaintiff TSE Equities Company Ltd. is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

27.     Plaintiff PBF Investments, Ltd is a Texas limited partnership with its principal place of business in Corpus Christi, Texas.

28.     Plaintiff Pagenergy Co., LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

29.     Plaintiff BNP Management LLC is a Texas limited liability company with its principal place of business in Corpus Christi, Texas.

30.     Plaintiff Wendy Bennett Black is an individual residing in Corpus Christi, Texas.

31.     Defendant Toby Shor is an individual residing at 4102 Ocean Drive, Corpus Christi, Texas 78411, Corpus Christi Texas, where she may be served with process.

32.     Defendant Toby Shor, as Trustee for Seashore Investments Management Trust is an individual residing at 4102 Ocean Drive, Corpus Christi, Texas, 78411, where she may be served with process.

33.     Defendant Toby Shor as Trustee of the Toby Shor 2004 GRAT Trust is an individual residing at 4102 Ocean Drive, Corpus Christi, Texas, 78411, where she may be served with process.

34.     Defendant Richard Daly is an individual residing at 2120 Sul Ross St., Houston, TX 77098, where he may be served with process.

35.     Defendant Douglas Allison is an individual residing at 4920 Ocean Drive, Corpus Christi, Texas, 78412, where he may be served with process.

## IV.
## JURISDICTION AND VENUE

36.     The Court has original jurisdiction under 28 U.S.C. § 1331 because Plaintiffs have asserted claims under 42 U.S.C. § 1983 as well as 18 U.S.C. § 1030.  This Court has supplemental jurisdiction over Plaintiffs' other claims in this lawsuit pursuant to 28 U.S.C. § 1367(a).

37.     Venue is proper in this district because Defendants either reside in this judicial district and/or a substantial part of the events or omissions giving rise to the claims herein asserted occurred in this judicial district.  28 U.S.C. § 1391(b).

## V.
## BACKGROUND FACTS

### A.  *The Underlying Suit and Arbitration.*

38.     At the outset of this saga, Paul Black was the owner, directly or indirectly, of Plaintiffs, several independently established and distinct business entities which focused principally on oil and gas and real estate.  In 2000, through an attorney Black had used who was

also a close friend, Kenton McDonald, Mr. Black was introduced to Toby Shor, a wealthy heiress to a family fortune, who was also McDonald's law client and wife.  McDonald brokered a transaction whereby Shor, through a trust created for her (of which McDonald was the trustee), loaned Black's businesses $2,000,000 evidenced by an interest bearing promissory note and purchased a 45% equity interest from Black's former partner in some of the various businesses. Unlike Mr. Black, who was interested in equity distributions, in large part because of her wealth, Shor was disinterested in current distributions, and, through McDonald, chose rather to "loan back" her distribution proceeds by increasing the face amount of her interest bearing note. By 2006, the face amount of the note was approximately $14,000,000 (of which amount approximately $6,000,000 was accrued interest).   Shor's trust had also entered another approximately $2,000,000 note transaction, which bore interest at 18% per annum. Amounts due Shor under these notes were personally guaranteed by Black, subject to significant reductions if certain future events occurred.

39.    Black had negotiated for himself a right to terminate the arrangements between himself and Shor.  Termination afforded Black certain advantageous rights, including the right to obtain an in-kind distribution of assets, saddle Shor with in excess of 45% of the combined entities' liabilities (including those personally guaranteed by Black) and achieve a reduction of the indebtedness to Shor's trust by in excess of 45% of the principal and interest due under the notes.

40.    Subsequently, in a domestic power struggle over whether McDonald's son would be allowed to remain in their home, Shor divorced McDonald and fired him as her attorney and trustee.  Because of his prior dealings with McDonald and Shor's unpredictable and capricious behavior, Black exercised his rights to terminate the arrangement. Recognizing how much Black

stood to gain from termination, Shor contended for the first time that she had been misled and defrauded, and Shor sought to deny Black the contractually guaranteed right to dissolve their partnership.  An arbitration ensued in which McDonald, the former attorney, trustee and husband of Shor, fearing for himself, his career, and his law license, denied all his dealings, agreements and understandings with Black.  A panel of three arbitrators denied Black the right to terminate the arrangements and awarded Shor (a) the full face amount of the notes and accrued interest, all totaling $21,389,385.00 (of which approximately $12,000,000.00 was interest) without the appropriate discounts and reductions; (b) $5,000,000 of punitive damages; (c) recovery of $2,454,281.00 for unspecified "tort" damages which, inconsistently, were already included within the amount contained in the notes; and (d) approximately $2,000,000 in attorneys' fees and expenses—for an award totaling approximately $31,000,000.  The arbitration award was irrational and rendered in the face of contractual undertakings that under Texas law made such an award unsupportable.  That award was affirmed by the Corpus Christi Court of Appeals.  The Texas Supreme Court is being asked to review that decision.   The merits of the arbitration award are not part of this Complaint except by way of context.

### B.  *County Court at Law No. 3.*

41.     As County Court at Law No. 3 had initially ordered the matter to arbitration, the arbitration award was brought back to that court for entry of judgment.  Judge John Martinez was the then-presiding judge of that court. The relationship between Judge Martinez and Defendant Allison was strong and deep.  Martinez had worked for a number of years as a lawyer under Doug Allison at Allison's profitable boutique plaintiff's firm. Martinez continued to work for and report to Allison up until the time he took the bench.  As a financial benefactor to Martinez, Allison worked to get Martinez on a judicial bench.  In an email dated April, 2005, for example, Allison stated to a close circle of his friends in the Corpus Christi plaintiffs' bar as they

considered which person the influential plaintiffs lawyers would back for a position on the Corpus bench:

> "As many of you know, I just finished dumping a chunk of money into John Martinez (in the city council race). I think that we got John's name into the public eye in a very positive way, and this has value (and is worth considering). This may be valuable for the 148th or for the purpose of having John run for Saldana's position (if this is a good choice). I will obviously abide by the group's decision on all of this, but I wanted to throw this out on the table."

42.    Allison also hosted parties and fundraisers for Martinez in Allison's palatial home. Allison was generally known to be not just a financial benefactor to Martinez, but someone who could exert control over Martinez.

43.    Allison began almost from the first, to attend hearings in this matter, although never entering a formal "appearance" on the record. With Allison in attendance at the confirmation hearings, Judge Martinez perfunctorily approved the arbitration award which is currently on appeal. Collection proceedings began soon thereafter.

### C. *Events of August 11.*

44.    In May, 2011, the Shor Parties (*i.e.*, Shor, SIMT and GRAT) filed an application against Black and certain entities he controlled or owned an indirect interest in, demanding turnover of certain specified assets under TEX. CIV. PRAC. & REM. CODE §31.002 (commonly known as the "Texas Turnover Statute"). This statutory provision allows for *non-exempt* property which is not otherwise appropriate for traditional execution, to be ordered "turned over" by a judgment debtor to (a) a designated sheriff for execution [(b)(1)]; or (b) a court appointed receiver with the authority to take possession of *non-exempt* property and sell it [(b)(3)]. The Texas Turnover Statute also allows the court to "otherwise apply" the property to the satisfaction of the judgment [(b)(2)]. In the original application for turnover filed on May 6, 2011, the Shor Parties requested that certain properties be turned over *to the sheriff* for execution and submitted

a form of order so stating as a part of their motion.  No action was immediately taken by the court on that application.

45.     Knowning the intimate relationship that Allison and Martinez had, the Shor Defendants turned to Allison to enlist his help to ensure that Martinez would approved an expedited and illicit turn over order.  Through the intermediation of Allision, purporting to act as the attorney for the partners of Paul Black (the partners being herein generically referred to as the Canales Group) brokered a secret deal between the Canales Group and the Shor Parties, pursuant to which the Shor Parties conveyed 10% of their judgment against Paul Black to the Canales Group in exchange for the Canales Group's unspecified cooperation.   This unspecified "cooperation" did not involve the payment of any money, nor did it involve the providing of any documents or background.  Indeed, the Shor Parties needed no "cooperation" in any traditional sense of the word.  What they needed – and agreed to pay for – was the assistance of the Canales Group principally through the relationship that their attorney – Allison – provided with Martinez. Following shortly after the reaching of the "cooperation" agreement with the Canales Group, Allision again went to work exploiting his relationship with Martinez.

46.     On August 8, 2011 by letter to the court, Defendant Daly submitted a *new* form of order to the court which was identical to the first order submitted except that the *new* order added a provision which inexplicably – without any pleading or supporting proof – stated as follows:

> Regardless of whether judgment debtors comply with this ORDER in a timely fashion, it is hereby ADJUDGED, ORDERED, and DECREED that Toby Shor, as Trustee for the Seashore Investments Management Trust, ***is owner of*** any and all of judgment debtors' interest in the entities listed in (a)-(w) above, and all real and personal property located at 500 N. Water Street, Corpus Christi, 78471. [Emphasis added].

If signed, this *new* form of order would effect an *immediate conveyance* of a host of designated assets to a judgment creditor.  On August 11, 2011, a few days after Daly's letter sending in the

draft *new* order, without hearing, this *new* order was signed by Judge Martinez.  That order is herein referred to as the "August Order."  The August Order stripped Plaintiffs of their property rights without hearing and without a legal basis. It was an unprecedented deprivation of property rights.  Further, the August Order was signed without determining the value of the assets judicially conveyed to the Shor Parties.  On information and belief it was summarily signed as a result of improper *ex parte* communications among Judge Martinez and the Defendants, most notably Allison, as there was no reason for Martinez to so sign on his own a patently illegal order without any pleadings supporting the relief sought and without a hearing.  These actions violated both procedural and substantive due process rights of Plaintiffs.  This was the arbitrary and irrational act of Martinez acting under color of state law and in conspiracy with Defendants to deprive Black of his rights solely to benefit private interests to which Judge Martinez was beholden.  Plaintiffs further contend that to the extent that the Texas Turnover Statute permits the Defendants to have judicially conveyed to them Plaintiffs' property in this fashion, where Plaintiffs were not judgment debtors and as third parties were not even before the Nueces County Court at Law No. 3, the statute is unconstitutional.

47.   The court's illegal, *ex parte* August Order judicially transferred to the Shor Parties any of certain judgment debtors'[1] ownership interests in the following entities:

"-Shares/stock/stock certificates/ownership interests in the following entities:

A.   500 N. Water St. Property I, LLC
B.   500 N. Water St. Property, LP
C.   5262 Staples, Ltd.
D.   5262 Staple GP, LLC
E.   5262 Staples II, Ltd.
F.   5262 Staple GP II, LLC
G.   5302 Mandell Property, LP

---

[1]   The judgment debtors directed by the August Order were Paul B. Black; PBF Investments, Ltd.; BNP Holdings, Ltd.; BNP Commercial Properties, Ltd.; BNP Management LC ; and TSE Equities I LLC.

> H.   5302 Mandell Property I, LLC
> I.   Bistro CP, LLC
> J.   Black Commercial Holdings, LLC
> K.   Black Energy Resources Co.
> L.   BNP Commercial Properties, Ltd.
> M.   BNP Exploration Company
> N.   BNP Networks, LLC
> O.   CCEX, LLC
> P.   HBP, Ltd.
> Q.   Intrepid Oil & Gas, LLC
> R.   Land & Bay Gauging, LLC
> T.   Pagenergy Company, LLC[2]
> U.   PBF Investments, Ltd.
> V.   RPH Financial Investments, Ltd.
> W.   TSE Equities I, LLC"

48.     The foregoing entities, mainly Texas limited liability companies and limited partnership interests, are herein sometimes collectively referred to as the "Subject Companies," and are Plaintiffs' herein, complaining of the seizing of their assets, the embezzlement of their funds, and the destruction of their businesses.

49.     Not only was the August Order procured illegally, it violated Texas law.  Texas law is clear that a judgment creditor *may not* seize control of a member's interest in a limited liability company.  *See* Tex. Bus. Org. Code §101.112.  That section expressly provides that a judgment creditor may obtain upon application to a court and right to be heard afforded to the debtor, a charging order on only *distributions* a judgment debtor receives on the judgment debtor's interest in a limited liability company.  The creditor may not under any circumstances get the membership interest itself and certainly may not interfere with the entities, assets and operations.  And getting a charging order on distributions is not a right, the court having considerable discretion in even deciding whether or not a charging order on distributions should be entered.  Moreover, the statute expressly provides:

---

[2]     The August Order skips from letter "R" to letter "T."

"The entry of a charging order is the **exclusive remedy** by which a judgment creditor of a member or of any other owner of a membership interest may satisfy a judgment out of the judgment debtor's membership interest." [Emphasis added].

50.      The Texas Business Organizations Code contains an identical prohibition on the seizing of partnership interests as well, making a "charging order…the **exclusive remedy** by which a judgment creditor of a partner or any other owner of a partnership interest may satisfy a judgment out of the judgment debtor's partnership interest."  TEX. BUS. ORG. CODE §153.256(d) (emphasis added).    Thus, none of those interests judicially conveyed to Shor by the August Order could be lawfully seized and a hearing on that issue alone would have prevented this abuse.  The interests are exempt.  It is clear that the original turnover motion filed by the Shor Parties on June 8, which presumably Judge Martinez was acting on, was therefore a fraud for a number of reasons, including the fact that the motion wrongly stated that all of the interests in the Subject Companies were "non-exempt," when Texas statutes plainly state to the contrary. Indeed, the Shor Parties knew full well about charging orders and their legal import.  The following examination by John Black, one of Shor's attorneys who was also involved in these matters as well as in the arbitration, which is taken from pages 1669-1670 of the arbitration transcript:

> Q. And then you look at 11.3, if someone made you or forced you to do the Transfer?
> A. Right. Where you have a **Charging Order which is -- that's what would apply here, and that's where a creditor of a Partner can go to the Court and get an Order out of the Court forcing the Partnership to recognize its rights against the Partner and put a Charging Order on any of the assets of the Partnership.**
> Q. And did you see anything in this case, that suggested that a Court Order or a Charging Order, or some other act under Law, required them to recognize a Transfer?

14

As shown herein, the truth of any of the allegations of the original turnover motion were irrelevant to the conspiracy's goal.

51.      Furthermore, some of the interests seized themselves held interests in other exempt companies whose ownership interests were in turn wrongfully seized. Hence, the seizure and transfer of Mr. Black's membership interests in the Subject Companies listed above was conducted under color of state law; without any right to be heard, valuation, or any other minimum due process protections; and was flatly prohibited by Texas law.  It was illegal and a violation of Plaintiffs' procedural and substantive due process rights.

52.      Not only did the *ex parte* August Order convey title in the Subject Companies to the Shor Parties, the court also explicitly conveyed title to the *underlying* real and personal property of some of these Subject Companies directly to the Shor Parties, damaging these Plaintiffs, who were not even parties to the underlying litigation.

53.      This, too, violated Texas law both because these Plaintiffs entities whose underlying assets were conveyed were not judgment debtors and also because TEX. BUS. ORG. CODE §101.112(f) explicitly states:

> "(f) A creditor of a member or of any other owner of a membership interest does not have the right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company."

TEX BUS. ORG. CODE §153.256(f) is identical with respect to partnership interests.

54.      The Texas judicial system was dramatically abused by the Defendants and in fact became a co-opted participant with the Defendants in these actions, the goal of which was to deprive Plaintiffs of their legitimate, constitutionally protected property interests and the ability to even determine the value of the assets taken for purposes of judgment satisfaction.  Plaintiffs' substantive and procedural due process rights have been violated.

55.     Not only did the Shor Defendants by judicial decree obtain legal title to Plaintiffs' properties, as will be stated more fully hereafter, they wrongfully exercised dominion and control over those assets.  In doing so, they destroyed their value and any chance that the Plaintiffs had for rehabilitating themselves, paying any lawful judgments that might be due, and otherwise salvaging a lifetime of work.

56.     The court's actions were not conducted in ignorance.  Almost immediately after the unlawful deprivation of Plaintiffs' property rights Paul Black's counsel brought to the attention of the court the massive abuse of process that was occurring.  Nothing happened.  After Black's interests were wrongfully and illegally taken by Defendants and destroyed, there remained no adequate remedy in seeking to have those orders reversed and the property returned. The damage to Plaintiffs was irreparable. Shor's ability to seize control of these assets for her own purposes was only made possible by the inexplicable cooperation, sanction, and coercive authority of the Nueces County judicial court system in general, and Judge Martinez in particular.  And the ability to manipulate Judge Martinez into action, in turn, was wielded by Allison.

**D.  _October Events_.**

57.     Prior to the June 8th hearing referenced above, two other entities in which Mr. Black owned an interest (not part of the Subject Companies) had been placed into bankruptcy proceedings and a trustee appointed.  The trustee of these two entities, in turn, had filed an adversary proceeding in bankruptcy court against Mr. Black and the Shor Parties.  In a proposed settlement that Black had reached with the bankruptcy trustee which was expressly made subject to bankruptcy court approval, Paul Black had agreed to pay the trustee the greater of a minimum sum from the operation of the Subject Companies or a certain percentage of their profits up to a capped amount.  Black also collaterally "conveyed" his interest in the Subject

16

Companies as security for the agreement obligations.  Although described as a "conveyance" of ownership, in reality it was merely a security interest, as the settlement provided that Mr. Black maintained absolute control of the entities and their operations and the trustee could only get actual ownership in the event of a default in the scheduled payment terms.  In short, he would have to foreclose on the interests and obtain a charging order as the law provides.  Most importantly, the entire transaction was expressly made subject to the bankruptcy court's approval.

58.     Shortly after agreeing to the proposed settlement and secured transaction, and application for the bankruptcy court's approval, the Shor Parties intervened and convinced the bankruptcy trustee that they had "a better deal."  Thus, before the bankruptcy court held a hearing on the approval of the Black settlement, the bankruptcy trustee and the Shor Parties executed their own contract regarding the purported "better" deal.  More details of this "better deal," which in fact was misrepresented to the trustee and the bankruptcy court, are set forth hereafter.  The bankruptcy court ultimately disapproved the proposed Black settlement transaction (thereby terminating any legal effect of the proposed transfers) and entered an order approving the Shor Parties' transaction.

59.     Following this, Plaintiffs' rights were again violated without any legal authority or plausible basis, when the bankruptcy trustee was *ordered* by Judge Martinez to convey[3] to the Shor Parties title to all of the "interests" that he held in the Subject Companies which he had received from Black as a result of the previous transaction.  This order is called the "October Order."  It was in essence an act ordering a third party not involved in the case to convey interests which may belong to Plaintiffs, to a creditor, without valuation, without seizure, without

_____

[3] While the court used the phrase "turnover" to Toby Shor, this cannot be a reference to the Texas Turnover statutes, as they only allow such a direction to a judgment debtor, not to independent third parties and certainly not to judgment creditors.

garnishment or attachment, and without any other due process protections.  This bizarre judicial act of Judge Martinez was again at the behest of the Defendants.

### E.  *Events of November, 2011.*

60.     Prior to late October and early November 2011, certain of the Plaintiff Subject Companies, HBP Partners, Ltd. and its general partner, CCEX, LLC, owned and operated a night club located at 500 N. Water Street in Corpus known as the Havana Club.  The Havana Club had borrowed money from Frost National Bank ("Frost") for operational purposes.  This loan was personally guaranteed by Mr. Black.  HBP Partners, Ltd. and its general partner CCEX, LLC are herein collectively known as the "Havana Entities".

61.     Previously the Havana Entities had had difficulty in making their payment obligations to Frost and Frost had filed suit in Nueces County Court at Law No. 4, Judge Klager presiding (such action being herein called the "CCL No. 4 Action").  In the CCL No. 4 Action, Frost had sued Paul Black individually, as well as HBP and CCEX (previously defined as the "Havana Entities").  None of the Defendants herein – particularly Toby Shor – had ever been parties to or had made an appearance in that case.  As a result of successful settlement negotiations, Frost on the one hand and Mr. Black and the Havana Entities on the other, had entered into an agreement which provided for the payment of certain sums to Frost on a regular basis.  The agreement also contemplated in general terms that if there was a default in these payments, an agreed judgment which was attached to the settlement agreement could be entered promptly by Frost in the CCL No. 4 Action.  The entry of the agreed judgment would allow Frost to proceed more quickly with its collection actions.  Up through November, 2011, the Havana Entities were in compliance with their payment schedule with Frost until the Shor Defendants, acting pursuant to the August Order as well as the October Order, seized actual possession and control of the Havana Entities and took specific control of all their assets, including computers

and cash, using the same for their own purposes.  As will be stated more fully hereafter, due to the conduct of the Shor Parties in taking for themselves cash from the Havana Entities and other Subject Companies, the Frost indebtedness was not paid and thus went into default, the agreed judgment previously given to Frost was filed, and Frost itself began collection actions against Mr. Black and the Havana Entities.

62.     The Bistro Restaurant was also located at 500 N. Water Street.  Black also owned Bistro CP, LLC, which owned extensive antiques, art, furniture and fixtures that were located on the restaurant's premises. Bistro CP, LLC was neither a judgment debtor of any of the Shor Parties, nor a debtor to Frost.  Coveting the Havana Club and Bistro for himself, Mr. Allison with the assistance of Mr. Black's former attorney – Toby Shor's former husband, and a former trustee of the Seashore Trust,  Kenton McDonald – formed an entity called "Mother Ocean, LLC" and secretly negotiated for a lease from the landowner of the building to take over the Havana Club and the Bistro.  It is at this point that the conduct of the Defendants became breathtakingly brazen.

63.     Knowing that he needed the assets which had previously been used by both the Havana Club and Bistro to continue the operations he was acquiring and that Frost had a security interest in the Havana Club assets, Allison approached Frost, through its attorneys, with a deal.

64.     Allison proposed to Frost that all of the artwork, tobacco and alcoholic beverages which had previously been associated with the Havana Club would be kept under lock and key. While protecting Frost from losing this property while Mr. Allison opened the Havana Club in his own right for business, it would leave Mr. Black who was personally liable to Frost completely exposed as Frost's foreclosure sale of these assets could hardly be expected to bring top dollar when they were kept under guarded lock and key unable to be exhibited or displayed

19

to prospective buyers.  Indeed, it virtually assured that Allison would be the "successful bidder."

Allison further proposed that all of the remaining furniture, equipment and supplies of the

Havana Club would be left in place for Allison to operate in his new business venture, even

though the wear and tear on this would obviously be detrimental to the interests of Mr. Black and

the Havana Entities.  Erroneously concluding that he had a "deal," Mr. Allison then determined

he needed "judicial blessing" on that deal, which would give him the protection of the State of

Texas.   Even though Allison was at no time a party to or had ever made any appearance as an

attorney or an interested party in the CCL No. 4 Action, he prepared an order to be entered in the

CCL No. 4 Action which memorialized what he apparently thought was his "deal."   The

proposed order which Allison intended to get signed – to lend the coercive power of the State of

Texas behind his "deal" – was put into the form of a court order to be signed by a judge.  This

proposed order falsely recited that there was an "agreed oral motion" which had been made by

Frost presumably in connection with some hearing which had never occurred.  This is a clip of

the introduction of the actual order:

## ORDER

On this the __3__ day of __November,__ 2011, came on to be considered the agreed oral motion of Frost National Bank, judgment creditor herein in conjunction with the Order of Sale issued herein and heretofore levied and the Court having considered same, enters the following rulings:

Again, however, there was no hearing; there was no oral motion, and certainly not by Frost; and

there was no agreement.   After reciting those false provisos, there was a place at the bottom for

the signature of the presiding judge and below that two signature blocks for signature by counsel

in the case to falsely make it appear that it was indeed an "agreed order," approved by all parties

of record.  The signature line for counsel showed a line for Frost.  Instead of a signature line for

Black, HBP and CCEX, the form of order provided for the signature of Defendant Daly, as "attorney for Toby Shor," even though Shor was never a party to this suit at all.  A clip of the actual counsel signature lines on the order is as follows:



As stated, Toby Shor was not a party to this case, as everyone knew;  the style of the case even so reflected.  Notably, this fraudulent order form actually intentionally even omitted Paul Black's name.  A clip of the actual style of this fraudulent order is as follows:



Paul Black's name, which comes after the "and" has been intentionally omitted.  With no notice to Frost and certainly no notice to Mr. Black or the Havana Entities, Allison procured the signature on this fraudulent order *not by Judge Klager*, the actual Judge of the CCL No. 4

Action, but rather by Allison's protégé, Judge Martinez, who was the judge of a different court. A clip of the actual signature of the "Judge Presiding" as it appears on this order is as follows:



There can be no mistake that this is the signature of Judge John Martinez.  Below appears a clip of the actual signature of Judge Klager from another unrelated order in that CCL No. 4 action which plainly demonstrates the differences in the signatures:



There is no question that the signature on the fraudulent order is the signature of Judge Martinez.

65.    As stated, the  CCL No. 4 order improperly signed by Judge Martinez – herein called the "fraudulent CCL No. 4 Order" – bears the signature of Defendant Daly indicating his involvement in and concurrence with this fraudulent scheme.  The Defendants then arranged for this fraudulent order to be placed in the court's file.  Although filed, the fraudulent CCL No. 4 Order was never presented to, agreed to by, or signed by Frost.

66.    On information and belief, when the fraudulent CCL No. 4 Order was, after entry, presented to Frost's attorney, he declined to sign.  Recognizing that without Frost's signature, the

22

fraudulent CCL No. 4 Order, having been filed was facially fraudulent, it was then secretly removed from the files of County Court at Law No. 4. Plaintiffs have obtained a certified copy of the record in that action and the fraudulent CCL No. 4 Order is not there --- it's gone. This official court record has been removed from the Court's files and destroyed. Plaintiffs aver that the removal could only have been accomplished by, or at the instruction of, the Defendants, all of whom had participated in procuring the order's execution and entry in the first place. The only thing which has allowed Plaintiffs to even know that the fraudulent CCL No. 4 Order had been entered was that the on-line docket sheet of the Nueces County Clerk referenced in the last entry that, on November 3, 2011, John Martinez had signed an order in County Court at Law No. 4 – even though he was the then – Judge of County Court at Law No. 3. A true and correct copy of the clip from the on-line docket sheet referencing the signature by Judge Martinez to an order in another court is below:

| 10/28/2011 | **Order of Sale** (Judicial Officer: Klager, James E. ) | | |
| 10/28/2011 | **Orders of Sale** | | |
| | HBP PARTNERS,LTD | Served | 11/17/2011 |
| | | Returned | 11/29/2011 |
| 11/03/2011 | **Order** (Judicial Officer: Martinez, John ) | | |
| | *in Conjunction with Order of Sale / I* | | |

This type of entry is made only after an official court order is filed and scanned into the Nueces County Court system. Moreover, someone at that court has since changed the on-line docket entry to reflect that fraudulent CCL No. 4 Order was actually entered by Judge Klager. A true and correct copy of that altered on-line docket sheet showing the change relating to this order follows:

| 10/28/2011 | **Order of Sale** (Judicial Officer: Klager, James E. ) | | |
| 10/28/2011 | **Orders of Sale** | | |
| | HBP PARTNERS,LTD | Served | 11/17/2011 |
| | | Returned | 11/29/2011 |
| 11/03/2011 | **Order** (Judicial Officer: Klager, James E. ) | | |
| | *in Conjunction with Order of Sale / I* | | |

23

67.     This is a cover-up, as the fraudulent CCL No. 4 Order was actually signed by Judge Martinez, not Judge Klager.  More importantly, again, the order itself – an official state record – has been purged by someone from the Court's files.  The Defendants no doubt were unaware of the fact that sometime after the CCL No. 4 Order had been entered and placed in the file, pursuant to standard protocol, the Nueces County Clerk's office had scanned the order into its systems.  Hence, Plaintiffs were able to obtain a copy of that order.  Possibly, the Defendants thought it had been removed from the Clerk's office prior to scanning.  Nevertheless, it has been intentionally removed and destroyed.  Not only is the fraudulent CCL No. 4 Order fraudulent on its face, it was entered without any notice to Mr. Black or the Havana Entities – or for that matter Frost – who were still parties to the matter, without hearing, in an *ex parte* fashion, after collaboration and conspiracy among the Defendants.  This was done by Defendants to deprive Plaintiffs' of their constitutionally guaranteed property rights for the benefit of private interests of third parties.  It is a violation of Plaintiffs' substantive and procedural due process rights.

68.     While these matters were occurring in County Court at Law No. 4, in County Court at Law No. 3, Judge Martinez had announced previously that his last day as the Judge of CCL No. 3 would be Friday, November 4, 2011.  On November 2, 2011, a hearing occurred in County Court at Law No. 3 before Judge Martinez.  At the November 2 hearing, Defendant Daly presented two draft orders to Judge Martinez for his consideration.  The first order was a draft "Amended Turnover Order".   The second order was a draft "Discovery Order".

69.     The draft Amended Turnover Order purported to amend the August Order, which the Shor Parties had theretofore been operating under.  Defendant Daly submitted the draft Amended Turnover Order "advising" the judge that the Shor Parties now wanted the judge to order Toby Shor to convey the interests she had been previously granted in the Subject

Companies – which she had exercised complete dominion and control over for some lengthy period of time – to a sheriff.  The draft Amended Turnover Order submitted on November 2 contained a recitation acknowledging that the interest in the Subject Companies as well as the Havana Properties had previously been conveyed "to Toby Shor, as trustee of the Sea Shore Investments Management Trust, **where such title currently resides**." (Emphasis added).

70.     Furthermore, however, the Draft Turnover Order submitted on November 2 concluded by reciting that the interests in the Subject Companies as well as the Havana Entities' assets themselves and the assets of the Bistro (which had now been added, as they were not in the August Order) were to be conveyed by Shor to the Sheriff.  In summary, if the Draft Amended Turnover Order of November 2 were signed, the court would be (a) re-affirming the Shor Parties' prior ownership and (b) ordering the assets, title to which were held by Shor, to be conveyed by Shor to the Sheriff of Nueces County.

71.     The Draft Discovery Order, on the other hand, submitted on November 2 was a draft order seeking collection discovery on Mr. Black.  Among other things, it sought an order compelling Mr. Black to be at his home at noon on Friday, November 4, for the Sheriff to be let in and allowed to conduct an inventory of Mr. Black's assets at his home.  Judge Martinez received both of these draft orders at the November 2 hearing and the hearing concluded at the end of the day on Wednesday, November 2, 2011.

72.     Following the close of this hearing, Black heard nothing of substance from either the court or the Shor Defendants.  Black was mindful, however, that Friday, November 4, 2011 was Judge Martinez's announced last day on the bench of CCL No. 3.

73.     The next thing Black heard of substance was an e-mail that Black's counsel received from Defendant Daly on Tuesday, **November 8**—after the judge had left office.  The e-

25

mail, timed at *11:11 a.m.* on November 8, transmitted two draft orders (one dealing with turnover and the other discovery) that contained material variations from the drafts the Shor Defendants had submitted on November 2.   Defendant Daly, at *11:11 a.m.* **on November 8**, transmitted these new, dramatically different draft orders, simply stating:

> "Here are revised proposed orders which were previously submitted to the court after the hearing."

For clarity these new draft orders – received at **11:11 a.m.** on Tuesday, November 8 – shall be referred to herein as the "New Draft Orders".   These New Draft Orders had never been submitted to Black for review and were not the subject of any notice to the Black or the affected Plaintiffs of their submission to the court prior to this time.   Furthermore, a review of the entire case file in County Court at Law No. 3 reveals that the New Draft Orders were never submitted to the court by means of electronic or manual filing with the clerk or the Court's staff.   There is no copy in the file, file-stamped or otherwise; no transmittal; and no record of the New Draft Orders ever having been presented to the court in anything other than an *ex parte* manner.

74.   Next, by email time-stamped *11:48 a.m.* on November 8 – some ***thirty-seven minutes*** after Daly transmitted the New Draft Orders – Daly sent another email to Black's counsel advising that Daly had "just" received actual signed copies of the draft orders Daly had sent merely 37 minutes ago.  A clip of Daly's actual email to Black's counsel is as follows:

> **From:** "rdaly@rdalylaw.com" <rdaly@rdalylaw.com>
> **Date:** November 8, 2011 11:48:10 AM CST
> **To:** Kevin Grillo <kevin@penaandgrillolawfirm.com>
> **Cc:** "rdaly@rdalylaw.com" <rdaly@rdalylaw.com>
> **Subject: Shor - Orders**
>
> Kevin:
>
> I was just sent copies of these orders.  Please note the time deadlines.
>
> Richard D. Daly

Richard Daly Law Firm
1100 Louisiana, Ste. 3500
Houston, Texas 77002
Ph:  713.655.1405
Fax:  713.655.1587
rdaly@rdalylaw.com
www.rdalylaw.com

This new email transmitted the New Draft Orders, but this time, they were *signed* by Judge Martinez, but dated November 4.  The executed orders which Defendant Daly transmitted at **11:48 a.m.** on November 2 are herein called the "November Orders" and consist of a "November Turnover Order" as well as a "November Discovery Order".

75.      Crucially, the fax transmitting the November Orders to Daly shows that they were in fact faxed to Mr. Daly on November 8, at ***11:10 a.m.***, *immediately before* Mr. Daly chose to send the New Draft Orders to Black.  A clip of the actual November Turnover Order, as faxed to Daly, and as Daly in turn sent to Black is as follows:

Nov.  8.  2011 11:10AM                                        No. 1272    P.  1

**CAUSE NO. 09-60343-3**

| | | |
|---|---|---|
| **PBF INVESTMENTS, LIMITED** | § | **IN THE COUNTY COURT OF** |
| **Plaintiff.** | § | |
| | § | |
| VS. | § | |
| | § | **NUECES COUNTY, TEXAS** |
| **TOBY SHOR AND SEASHORE** | § | |
| **INVESTMENTS MANAGEMENT** | § | |
| **TRUST** | § | |
| **Defendants.** | § | **COURT AT LAW NO. 3** |

**AMENDED ORDER ON TOBY SHOR'S AND SEASHORE INVESTMENTS
MANAGEMENT TRUST'S APPLICATION FOR TURNOVER ORDER**

The header at the top clearly shows it was faxed to Daly at 11:10 a.m.  Thus, by pretense – for reasons which shall shortly be set forth – Daly transmitted the New Draft Orders in draft form, *after* he had in his possession the actual signed orders themselves.  Neither Black nor the Plaintiffs themselves, on the other hand, had received no such fax from the court, even though all court personnel were well aware of the fact that Black was a named party in that action and had vigorously participated in all hearings which had occurred in that matter from inception.  Concerned, Black's counsel called the clerk of the County Court at Law No. 3 and asked whether the clerk had faxed any orders out in the case.  The clerk advised Mr. Black's counsel that she had not.  Black's counsel then inquired of Daly, demanding to know when the New Draft Orders had actually been submitted – and Daly refused to respond.  Given that the court clerk denied sending the fax, it is noteworthy that this fax header bears a striking resemblance to the fax header coming from Allison's office, with his office information potentially removed.  A clip of an unrelated fax header originated from Allison's office is as follows:

```
Feb. 15. 2012  5:03PM    LAW OFF OF DOUGLAS ALLISON                No. 1464   P. 1
```

76.    The November Turnover Order, as noted, is materially different from the Draft Turnover Order submitted on November 2.  In part, the November Turnover Order includes clauses which are solely protective of Mr. Allison and his interests in both the Havana Club (which opened under his new ownership on November 4) as well as the Bistro which Mr. Allison was making plans to open shortly thereafter.  For example, whereas the Draft Turnover Order submitted on November 2 provided all Havana Club and Bistro assets were to be turned over to the Sheriff, the November Turnover Order provided that they were to be treated differently:

| Language of Draft Turnover Order Submitted on November 2 | Language of November Turnover Order faxed by Daly on November 8 |
|---|---|
| "It is therefore ORDERED that the following property shall be turned over ... to Sheriff Jim Kaelin....:... | "It is therefore ORDERED that the following property shall be turned over ... to Sheriff Jim Kaelin....: ... |
| -all personal property located at 500 N. Water Street, Corpus Christi, TX, in space that had been occupied by entities controlled by Paul Black, including such personal property located in the Havana Club and 500 Bistro. | -all personal property, _which shall not include attached fixtures (such as light fixtures, chandeliers, and attached sinks, refrigerators, stoves, and other equipment),_ located at 500 N. Water Street, Corpus Christi, TX, in space that had been occupied by entities controlled by Paul Black, including such personal property located in the Havana Club and 500 Bistro.

_It is further ORDERED that all personal property made the subject of this Order that is located upon those premises known as Havana Club and 500 Bistro shall be maintained in place, subject to normal wear, tear, and use of those on-going operations upon the premises, and shall not be removed from such premises by the Sheriff or another until after final ownership is determined upon completion of the Sheriff's sale of same in place._" (emphasis added) |

77.     As a result, the Sheriff was specifically precluded from taking any light fixtures, chandeliers, sinks, refrigerators, stoves or equipment at all.  This clause was obviously inserted at Mr. Allison's behest, as the new owner of the Havana Club and soon to be operator of the Bistro. It afforded no benefit to the Shor Defendants at all.

78.     Furthermore, it specifically ordered that all personal property which was located on the premises of the Havana Club and the Bistro were to be maintained in place and not taken by the Sheriff for sale – or anyone else.  This would allow Mr. Allison the continued, uninterrupted use of these properties and deprive the Plaintiffs not only of the right to possess the property, but also of any hope of obtaining maximum dollar value for their sale in any

subsequent execution which might occur – even though such would be clearly wrongful.   In

short, it ensured they would go to Allison.

79.    Where the Draft Discovery Order submitted on November 2 had specifically

stated that Paul Black was to be at his home on Friday, November 4 at noon, the November

Discovery Order now had a provision which ordered Mr. Black to be at his home on Wednesday,

November 9 at noon and further added that if he was not present that he was to be arrested.

| Language of Draft Discovery Order Submitted on November 2 | Language of November Discovery Order faxed to Daly on November 8 |
|---|---|
| **4.   Writ of Execution.**  The Clerk of the Court shall issue a new writ of execution immediately, and Paul Black is ordered to be at his house at 12:00 pm on Friday, November 4, 2011, and let the Sheriff and/or constable into the house to execute on non-exempt assets.    Paul Black and Wendy Black are ordered not to remove assets from their house prior to that time. | 4. **Writ of Execution.**  The Clerk of the Court shall issue a new writ of execution immediately, and Paul Black is Ordered to be at his house in Corpus Christi, Tx at 12:00 noon, on Wednesday, November 9, 2011, and let the Sheriff and/or constable into the house to execute on non-exempt assets, or let capias be issued for the arrest of Paul Black. |

Furthermore, even more draconian, new provisions were added to the Discovery Order:

| Language of Draft Discovery Order Submitted on November 2 | Language of November Discovery Order faxed to Daly on November 8 |
|---|---|
| *No comparable provision* | 4.  Paul Black is also hereby Ordered to allow full and complete access of his home in Corpus Christi, Texas, on or before November 11, 2011, to two (2) of Seashore's attorneys and one appraiser or other person of Seashore's attorney's choosing.  Such access shall not be limited or selective, but rather such access shall be to all rooms, storage areas, and all areas of the home. Such access shall be limited to six (6) hours.

*** 

5. Paul Black and Wendy Bennett Black are |

|  | ordered not to remove assets of any kind from their house from the date of this Order, through November 11, 2011 (6 p.m.) or thereafter (until such time as Seashore's attorneys have completed their access to the house and its contents as allowed in paragraph 4, herein above). |
|---|---|

80.    Plaintiffs contend that even though they appear to be dated November 4, 2011, the November Orders were not signed on that date, but rather on the morning of November 8, shortly before they were faxed by some unknown person to Defendant Daly.  The following facts clearly indicate this.

81.     By early November, Allison believed he needed judicial protection to secure his plans for the Havana Club and Bistro.  He needed to make sure that Plaintiffs' assets that he desired, would not be taken by the Sheriff for sale, or by anyone else.  Allison needed the Shor Defendants' help, since he was a party to neither the Frost lawsuit pending in County Court No. 4 nor the Shor lawsuit pending in County Court No. 3.  The Shor Defendants, in turn, needed Mr. Allison's continued influence over Judge Martinez in order to assure that the discovery order they sought, with its obvious draconian provisions, would be entered.

82.    Allison's first attempt at protection was to approach Frost, as alleged above, and get them to go along with the sham evidenced by the fraudulent CCL No. 4 Order.  The Shor Defendants were willing participants and Defendant Daly willingly signed the fraudulent order, as did Judge Martinez.  As noted, in signing the fraudulent CCL No. 4 Order, Judge Martinez entered an order for another court even though (a) he was not the judge of that court, (b) there was no emergency at all (other than Allison's), (c) there was no hearing, (d) there was no "agreed oral motion" of Frost or anyone else, (e) the real named defendants had no notice of what was going on, and in fact were engaged in discussions at that very time with Frost to try to

maximize any execution sale value, and (f) even Frost had not agreed to it. The only people who had agreed to it were the Defendants and Judge Martinez. Thinking they had the necessary protection for the fraudulent CCL No. 4 Order, there was at that time no reason to attempt to include any of Allison's protective language in any orders submitted to County Court at Law No. 3. The fraudulent CCL No. 4 order contained all the protection Allison needed.

83.     However, when it was realized by the Defendants that Frost would not participate in the fraudulent CCL No. 4 Order sham, a new plan was needed. Although it was an official record, they first destroyed the fraudulent CCL No. 4 Order, removing it from the court's file (not realizing it had already been scanned). They then turned back to Judge Martinez. However, by the time it was realized that Frost was not going to "play ball," Judge Martinez had already left his bench – November 4 having been the announced last day of his tenure. Allison knew his relationship with Martinez was strong, but in this case he needed to call in a large favor and Allison was not sure whether he was going to be able to convince Judge Martinez to sign the New Draft Orders after he had left the bench. Thus, the New Draft Orders were given to Martinez, and Daly had to wait to see if they would be signed – or even if they needed to be changed again for Allison. When Daly finally received the signed orders on November 8 – faxed by someone other than the court's personnel and only to Daly – Daly knew that Allison had succeeded. The problem was that Daly knew there was no record of the *signed* orders, which he now had, having ever been filed with or given to the court in draft form in the first place. There were no transmittals, no file stamps, and no electronic notations. Just as important, Daly knew that Plaintiffs had received nothing indicating even a request that orders different from those previously submitted on November 2 be entered. Daly thus knew that he had to do something to attempt to deflect the obvious questions as to when and how these forms came into being and got

32

into Martinez' hands.  Therefore, at *11: 11 a.m.* on November 8th, *after* he had in his possession the signed November Orders and now knew they had been approved, only then did he send out the New Draft Orders to try to make the timeline work.  Waiting what he thought was a suitable amount of time – 38 minutes – he then emailed the signed orders, attempting to create an artificially plausible timeline to cover for the Defendants

84.     These sequences of events are even more plausible when the Draft Discovery Order is considered. The draft Discovery Order submitted at the hearing on November 2 included a clause that, as noted above, the sheriff was to meet Black at his home at noon on Friday, November 4.  The November Discovery Order, on the other hand, states that the inspection was to be Wednesday, November 9 at noon.  As everyone knew that Martinez' last day on the bench was Friday November 4, even in a worst case scenario for the Shor Defendants, an order signed at the end of the day on the 4th, could have included an inspection date of Monday the 7th, or Tuesday the 8th.  A draft order submitted before the 4th would surely have so stated.  The fact that the Draft Discovery Order included a forced inspection date of November 9, given Shor's eager anticipation of this event, further supports the inference that Defendants were not sure whether they could convince Martinez to sign and they needed to leave themselves plenty of time.  No doubt, the inclusion in the Discovery Order of the grant to two (2) of Shor's lawyers and a third person of the choosing of those lawyers, to have the unfettered right for **6 hours** to come into the Black's home and rummage through every closet, every drawer, and under every bed, was one of the quid pro quos that was exchanged for Allison getting all of this done

85.     At a minimum, even if the November Orders were in fact signed on November 4, 2011 – and objective evidence strongly infers that they were not – the orders are in fact a

violation of Plaintiffs' substantive and procedural due process rights.  The orders were submitted to the court after a contested hearing, (a) in an *ex parte* manner, the court files containing no record or evidence of any draft orders even having been filed, (b) without copies having been provided to all parties, (c) without explanation, argument, or justification, (d) with material provisions having been included, and (e) Plaintiffs having been deprived of any ability to be heard on the matter.  Furthermore, these November Orders deprived Plaintiffs of their property rights, including the ability to own and possess their property, or a minimum even if such was to be sold, for these assets to be sold in a context which would maximize value for the purposes of debt reduction—even though Plaintiffs were not judgment debtors and were not even parties to the underlying litigation.  The wrongful actions were done under color of state law, solely to benefit the private interests of Defendants.

86.     Furthermore, whether the November Turnover Order was entered on November 4 or November 8, it was not only tainted with corruption, it violated Plaintiffs' civil rights as the court actually ordered a creditor (Toby Shor) who was not a judgment debtor to convey title to property to a sheriff for sale, after the property had for months been titled to the creditor and actually in the creditors' hands.  There is no rule of law that permits a court to (a) forcibly take property from a citizen; (b) without hearing or valuation convey it to a creditor; (c) take the property from the creditor; and (d) convey it to a sheriff—especially the property of third parties who are not judgment debtors and not even parties to the litigation.  The actions of the court are without reference to any guiding principles.  This property belonged to the Plaintiffs.  It was wrongfully taken under color of state law solely to benefit the private interests of Defendants.

87.     Following the entry of the November Turnover Order, Shor in fact transferred title to the property to the Sheriff.  Shor, by court order, has conveyed actual title of Plaintiffs'

property to the Nueces County Sheriff, a state official who currently holds the property.  Both the transfer of the property and its receipt and possession by the Sheriff, are actions under color of state law. While in the context of the Turnover Statute itself (Tex. Civ Prac. & Rem. Code Ann. §31.002), the phrase "turnover" has a specific meaning, in the context of a creditor using that phrase in connection with a conveyance, the statutory meanings set forth in §31.002 are not applicable.

88.     Indeed the Shor Defendants have judicially admitted that a conveyance of title was precisely what they intended, as not only does the document so state, they have stated as follows:

> "The bottom line is that title to the assets at issue (which appear to be worthless) are currently vested in the name of the Nueces County Sheriff, and are being held until this court orders that they be sold."

89.     Thus, because of the actions of the Defendants, the Nueces County Sheriff – another state official – purportedly held Plaintiffs' property making the Nueces County Sheriff an active participant in the wrongful deprivation of the property rights of Plaintiffs under color of state law.  On November 8, 2011, Mr. Black posted a supersedeas bond superseding execution of the judgment.  As a result of the November Turnover Order, Mr. Allison has since enjoyed the judicially sanctioned, unfettered use of Plaintiffs' property, without compensation, since November 2011.

90.     Moreover, the very timing of these events shows they were a fraud. Having moved quickly to get Martinez to give her title to the Designated Entities, when Judge Martinez was getting off the bench in November 2011 – and Shor was losing her "rubber stamp" – Shor then was desperate to divest herself of the interests that she had worked to seize from the beginning and asked Judge Martinez to rubber stamp another order "ordering" Shor to convey

title of those same entities to the Nueces County Sheriff. That Order was signed and Shor "transferred" her interest in twenty-four companies to the Nueces County Sheriff. That Shor would (a) first ask Martinez to have the sherriff seize and sell the assets;  (b) then abruptly ask Judge Martinez to convey her title to these entities, and (c) then, as he is leaving the bench, ask Martinez to order her to convey title in these entities to the Nueces County Sheriff, reeks of malfeasance.

F. *__Actions of the Defendants Drive the Value of the Subject Companies Into the Ground__*.

91.     As has been alleged, Plaintiffs have been deprived of his property in violation of constitutionally guaranteed rights not only under color of state law, but with the full coercive sanction of the State of Texas.  At some point even before the August Order, but in all events following the August Order, the Shor Defendants assumed full control of the Subject Companies. This assumption of control was not a theoretical or technical matter, but a full operational control.  Shor, among other things, met with employees of the Subject Companies; met and communicated with tenants of the Subject Companies; collected and kept significant rentals from clients/tenants of the Subject Companies; dealt with and disposed of the companies' assets; made managerial decisions for the Subject Companies; and communicated with creditors of the Subject Companies.  She did so representing herself as the new owner of all of the Subject Companies.

92.     Without limiting the generality of the foregoing, with respect to the real property located at 5262 Staples Blvd. in Corpus Christi, Texas, which property was owned by various limited partnerships and limited liability companies (herein collectively called "5262 Staples") which in turn were predominantly owned and operated by Mr. Black, the Shor Defendants collected and pocketed significant rentals from the tenants and refused to pay the October and November mortgage payments to the lienholder of that building. Prior to that seizure, all mortgage payments were current with the lender. Shor seized control of this building and began

to collect the rentals therefrom. She neither paid the lender the mortgage payments due, nor took care of covering the operating expenses on the building, thereby allowing it to go into a state of extreme disrepair.   Notwithstanding protests and notices sent by the lender, the Shor Defendants continued to pocket the tenant rentals even when the lender sent notices of default which the Shor Defendants themselves had created by their non-payment.   The notices of default by the lender also noticed as an additional event of default that a "change of control" had occurred, tied to the fact that the Shor Defendants had actually taken control of the 5262 Staples entities in the wrongful judicial proceedings hereinabove complained of.   Not only was the building posted for foreclosure, Shor's misconduct and misapplication of the monies she had received was so severe that the lender was forced to put the building into receivership.   The lender filed a verified petition in which a receiver was appointed.   The receivership petition notes specifically that Shor had collected four months' worth of rent, and yet used none of the proceeds to pay the lender or for operating expenses. The conduct of the Shor Defendants in wrongfully taking possession of the Subject Companies and their property, thereby triggering an event of default, and then refusing to properly attend to the business and affairs of the Staples Building creditors, resulted in this property being lost at a foreclosure sale in January, 2012.

93.     With respect to the Havana Entities, Shor did the same thing.   She met with employees, creditors, and business partners and assumed control of the assets of that business. She diverted significant cash from the companies, engaged in little to no competent negotiation with the landlord of the building, which ultimately opened the door for Allison to move the Havana Entities out of the way and take control of this business operation himself.   Furthermore, the Havana Entities were operating with sufficient cash flow to make payments to Frost. Following the judicially-orchestrated conveyance of ownership in the Havana Entities in favor of

the Shor Defendants and the diversion of funds by the Shor Defendants, a default was triggered and the Frost indebtedness was accelerated, which set in motion a cascading series of events which resulted in the foreclosure by Frost as referenced above.

94.     Shor's actions by obtaining a judicially coerced seizure of the assets of the Plaintiffs resulted in the destruction of delicate negotiations with other significant lenders.  Black was in very intense negotiations for the restructuring of debt and the avoidance of foreclosures.  Indeed, the payment of a small sum would have forestalled an imminent foreclosure.  Significant oil and gas assets and rights were lost or forfeited based on the actions and inactions of the Shor Parties.  Shor having been fraudulently given ownership of these entities, put herself in the position to absolutely control these events and Plaintiffs were excluded.  Her conduct was the proximate cause of significant damage to the Plaintiffs and the loss of their property.

95.     The Shor Parties have not only diverted hundreds of thousands of dollars from these entities, they have done so giving no value or credit to Black on the judgment on which, for now, he is otherwise indebted.  Moreover, the Shor Parties contend that Black may not get relief in the state court under the judgment, but must file a separate lawsuit such as this for claims such as conversion and for redress.  ***These Plaintiffs absolutely must do so, as they were not judgment creditors and were not even joined as parties to the litigation in which their assets, properties and companies were seized wrongfully.***

96.     On information and belief, although Shor was able to convince a bankruptcy trustee and bankruptcy judge that her offer to the bankruptcy trustee was "better" than that of Mr. Black, she failed to advise the bankruptcy trustee and the bankruptcy court, that she intended to and did seize assets which she had no right to obtain, and thus, misrepresented to both the bankruptcy trustee and the bankruptcy court the prospects of what the bankruptcy trustee was

likely to receive from her collection actions.  On information and belief, Plaintiffs assert that these misrepresentations were made by the Shor Defendants solely to block Paul Black from engaging in his transaction with the bankruptcy trustee, so as to further her attempt to legally remove Paul Black from all operational rights.  These actions were taken, on information and belief, to induce the bankruptcy trustee, and in fact the bankruptcy court, to approve a transaction with Shor which she had no intention of honoring.  The bankruptcy trustee's agreement with Shor only entitles the bankruptcy trustee to receive from Shor, payments received by Shor on the claims *which the bankruptcy trustee himself assigned to her*.  The Shor Defendants, however, misrepresented to the bankruptcy trustee that he would be entitled to receive a percentage of all of the Shor Defendants' collection actions.  That this misrepresentation was made by the Shor Defendants to the bankruptcy trustee and then in turn to the bankruptcy court is substantiated by not only the language of the agreement itself, but the conduct of the Shor Defendants.  On information and belief it is alleged that the Shor Defendants have not paid any sums to the bankruptcy trustee notwithstanding the fact that literally hundreds of thousands of dollars have been received by Shor, and far more could have been received had she acted with a minimum of good faith and exercised a modicum of business judgment.  Had Shor actually intended to make payments on her collection actions on her judgment, a significant portion of those funds would have gone to the bankruptcy trustee, and they did not.

97.     In seizing control of these entities and the assets, the Shor Parties have wrongfully accessed computer records and files belonging to both Black and the Plaintiff Subject Companies, not only accessing such, but on information and belief, destroying the same, and wrongfully utilizing information contained in those computer records to attempt to further their

own purposes, depriving the Plaintiffs of their property rights and gaining as much cash as they could from their illicit conduct.

98.     Given the fact that the Shor Defendants' seizure of Plaintiffs' property and interests was wrongful, they were not entitled to act as creditors while this property was and is in their control. Rather the Shor Parties took upon themselves fiduciary duties to operate the assets and businesses of the Plaintiffs and manage any liabilities with utmost good faith, fair dealing, candor, honesty, loyalty, skill and integrity.  The Defendants' duties to Plaintiffs have been repeatedly and persistently breached and violated.

99.     The conduct of the Defendants herein complained of has been the proximate cause of massive financial losses to Black and Plaintiffs in addition to the cause of enormous strain, embarrassment, humiliation, and deprivation of all manner of Plaintiffs' constitutional rights.  For these actions, and others which Plaintiffs will prove at trial, the Defendants must be held accountable.

## VI.
## CAUSES OF ACTION

### A.   *Procedural and substantive due process claims under the 14th Amendment of the United States Constitution – 42 U.S.C. §1983 – All Defendants*

100.    Plaintiffs reallege and incorporate all of the allegations set forth above.

101.    The acts hereinabove complained of constitute a violation of Plaintiffs' procedural and substantive due process rights guaranteed under the United States Constitution.  Without limiting the generality of the foregoing, the Plaintiffs have been deprived of rights secured by the Constitution and laws of the United States by persons acting under color of statutes and state law of the State of Texas.  Furthermore, the actions hereinabove complained of have involved a conspiracy among all of the Defendants which have caused the deprivation of Plaintiffs'

constitutional rights.  The Plaintiffs allege that the Texas Turnover Statute, to the extent it purports to permit the conduct hereinabove complained of, is unconstitutional in that, among other things, it permits the deprivation of a person's rights and property without notice, without hearing, and without property valuation—and certainly that it permitted the taking of third parties' property when Plaintiffs were not judgment debtors and were not even parties before the Court.  Furthermore, the acts hereinabove complained of are fairly attributable to the State of Texas.  The actions hereinabove complained of have been taken together with officials of the State of Texas and the Defendants have obtained significant aid from such state officials.  But for the material participation of officials of the State of Texas, the actions and conduct of the conspiracy could not have occurred.  Plaintiffs allege that the Defendants herein willfully participated in joint action with state officials, and at all times the state officials both knew of the illegal goals of the conspiracy and intended to act outside of the law.

102.    The actions hereinabove complained of taken by the State of Texas involve conduct by which the state has exercised extreme coercive power directly and overtly in a manner that the Defendants have been able to utilize for their own purposes.

103.    Based on the allegations here and above set forth Plaintiffs have been damaged in his property and possessions to which he is lawfully entitled to compensation.  In addition to the recovery of damages, Defendants' violation of 42 USC §1983 entitles Plaintiffs to an award of attorneys' fees under 42 U.S.C. §1988.

### B. *The computer fraud and abuse of the 18 U.S.C. §1030 – The Shor Defendants.*

104.    Plaintiffs reallege and incorporate all the allegations set forth above.

105.    The computers and computer system used by the Plaintiffs were used in interstate commerce.  As such the computers were protected computers pursuant 18 U.S.C. §1030 (e)(2)(B).  The Shor Party Defendants violated 18 U.S.C. §1030 (a)(2).  The Shor Defendants

intentionally used the computers improperly seized without authorization.  As set forth above, the assets and properties of each of the Plaintiff Subject Companies was exempt from seizure. Hence, notwithstanding the illicitly obtained judicial blessing, the Shor Defendants had no legal right to access these computers for their own personal gain.  At most, even with the illicit seizure, even if accessing the computers would have been lawful it would have been so only for the purpose of advancing the genuine business purposes of the company to which such computers belonged and fulfillment of the Shor Defendant's fiduciary duties, and not otherwise. The Shor Defendants were not authorized to remove any assets of the Plaintiff Subject Companies off of the premises, copy information for their own purposes and use or access the computers for purposes of determining cash to be appropriated for their own purposes and uses, or otherwise access any computers beyond the legitimate use or purposes of advancing the interests of the Subject Companies.

106.   The Shor Defendants violated 18 U.S.C. §1030(a)(4).   The Shor Defendants knowingly and with the intent to defraud the Plaintiffs, accessed protected computers without authorization, and by means of such conduct further intended fraud and to obtain the companies' assets particularly in the form of cash.   Without limitation the Shor Defendants have on information and belief accessed these computers, not only for the purposes of determining and gaining cash, but also for purposes of accessing information about Paul Black and the Plaintiff Subject Companies to which they were not entitled.  The Shor Defendants have acted knowing that all the information was exclusive property of the Plaintiffs and that they were not entitled to even be accessing it.  In so doing, the Shor Defendants have wronged the Plaintiffs and their property rights by dishonest methods and schemes and have deprived the Plaintiffs of their valuable assets by trick, deceit, chicane and overreaching.   The Shor Defendants have

appropriated for their own use property of the Plaintiffs, in actual and/or constructive fraud of Plaintiffs.

107. The Shor Defendants have violated 18 U.S.C. §1030(a)(5).

108. 18 U.S.C. §1030(g) provides a civil cause of action for any person who has sustained damage (defined in 18 U.S.C. §1030(e)(8)(n)) or loss (defined in 18 U.S.C. §1030(e)(11)). Plaintiffs have sustained both damage and loss for which the recovery of damages is sought herein. The loss exceeds $5,000.00.

## C. *Breach of Fiduciary Duty – the Shor Parties.*

109. Plaintiffs reallege and incorporates the allegations set forth above.

110. In seizing the assets and properties hereinabove complained of, the Shor Parties took upon themselves and assumed duties of utmost good faith, fair dealing, candor, honesty, loyalty, skill and integrity. These duties obligated them to operate the assets seized for the benefit of the Plaintiffs. Even though they assumed this position and these duties in the context of general hostility with Plaintiffs, the existence of hostile relations does not excuse, discharge or dissipate the duties which they assumed. Notwithstanding these duties to which the Shor Parties voluntarily subjected themselves, they have wholly abused their positions and duties, taking funds from Plaintiffs, neglecting responsibilities, making grossly negligent if not intentionally dishonest, decisions which caused significant damage to the Plaintiffs hereinabove set forth.

111. As described above, the Shor Partiess have engaged in conduct that was directly contrary to these duties and in fact have not only been grossly negligent, or worse, in their conduct of the businesses of the Plaintiffs, but they have improperly stolen cash and assets from the Plaintiffs for which no accounting has been rendered and for which Plaintiffs pray.

112. Plaintiffs have been damaged by such conduct and requests recovery of all damages to which he may show themselves justly entitled. Without limiting the generality of the

foregoing, Plaintiffs are entitled to recover not only lost profits, but all value of all lost business opportunities which have been occasioned by the wrongful conduct of the Shor Parties.

113.    Plaintiffs have suffered significant damages as a result of the actions of the Shor Parties in breach of these duties.   The Shor Parties have performed these actions willfully, intentionally and with malice, warranting the imposition of exemplary damages, and the imposition of a constructive trust over the assets and property of the Plaintiffs which may still be left after the improper expropriations.

114.    Further, the Shor Parties' actions were committed with legal malice, such that the Plaintiffs are entitled to recover and request exemplary damages from the Shor Parties pursuant to Texas Civil Practice and Remedies Code §41.001 et. seq.

### D.  *Conversion – the Shor Defendants.*

115.    Plaintiffs reallege and incorporates the allegations set forth above.

116.    The Shor Defendants assumed and exercised dominion and control over Plaintiffs' properties as hereinabove set forth in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Plaintiffs' rights.  The Shor Defendants' conduct constitutes conversion under Texas law.  Plaintiffs have been damaged by the Shor Defendants' conversion. Plaintiffs' damages include but are not limited to the loss of value for all of his property, lost profits, diminished value, loss of goodwill, among a host of other things.

117.    Further, the Shor Defendants' actions were committed with legal malice, such that the Plaintiffs are entitled to recover and request exemplary damages from the Shor Defendants pursuant to Texas Civil Practice and Remedies Code §41.001 et. seq.

### E.  *Equitable Estoppel and Judgment Forfeiture – the Shor Parties.*

118.    Plaintiffs reallege and incorporates the allegations set forth above.

119.     The Shor Parties are holders of a judgment in the approximate amount of $31,000,000.00.  The conduct of the Shor Parties, taken with the other Defendants hereinabove set forth, renders them equitably estopped from asserting any claims under that judgment as against the Plaintiffs for all purposes.

120.     As a direct and proximate result of the actions of all the Defendants hereinabove set forth, the ability of the Plaintiffs to satisfy that judgment has been materially and unalterably compromised.  Because of the abuses herein set forth, the Defendants should be equitably estopped from pursuing any collection actions on the judgment and the judgment should be deemed satisfied.

121.     Furthermore, as a result of the conduct herein complained of, any and all rights which the Shor Parties Defendants may have to the judgment should be forfeited.  Particularly given the fiduciary obligations and duties undertaken by and imposed upon the Shor Parties, and because of the inequitable conduct and other wrongs herein complained of, none of the Defendants should be entitled to any further collection rights with respect to the judgment.  All such rights thereunder arising should be cancelled for all purposes.  This forfeiture is consistent with governing law, which allows for forfeiture of amounts based on fiduciaries' misconduct.

### F.  *Tortious Interference with Contract and Prospective Contract – All Defendants.*

122.     Plaintiffs reallege and incorporate the allegations set forth above.

123.     The Defendants tortiously interfered with the contractual rights and potential contractual rights of the Plaintiffs.  Without limiting the generality of the foregoing, the Defendants have tortiously interfered with the contract entered by Paul Black with the bankruptcy trustee, as hereinabove set forth.  The Defendants tortiously interfered with the prospective contractual relations between Plaintiffs and the new landlord who would take over

the premises occupied by the Havana Club and Bistro.  The Defendants tortiously interfered with and caused significant damage to the business relations by the Plaintiffs with their various creditors, including without limitation, (a) Frost Bank, (b) Midlands Loan Servicing, as agent for certain lenders, and (c) Wells Fargo Bank, N.A., trustee.  Defendants tortiously interfered with other rights including without limitation the contractual rights that Plaintiffs had with seismic arrangements regarding Western Geco.

124.    All of these acts were taken with the intent to deprive the Plaintiffs of their legitimate actual and expectant contractual rights.  Each of these Defendants is, therefore, liable for tortious interference with contract as well as tortious interference with prospective economic advantage.

125.    Further, the Defendants actions were committed with legal malice, such that the Plaintiffs are entitled to recover and request exemplary damages from the Defendants pursuant to Texas Civil Practice and Remedies Code §41.001 et. seq.

### G. *Conspiracy – All Defendants.*

126.    Plaintiffs reallege and incorporates the allegations set forth above.

127.    Each of the Defendants has acted as part of a conspiracy against the Plaintiffs to deny the Plaintiffs their rights and privileges.  In particular, each of the Defendants has engaged in a conspiracy to breach fiduciary duty, conspiracy to tortiously interfere with contracts, conspiracy to abuse legal processes, conspiracy to convert property, as well as a conspiracy to deny Plaintiffs their constitutional rights.  The Defendants have conspired with other third parties named and unnamed herein.  The conspiracy started at an unknown time, but has continued well after the entry of the fraudulent orders herein complained of.  As such, each of the Defendants is liable for having conspired in such fashion, and is jointly and severally liable for damages suffered by Plaintiffs as a result of the conspiracy.

### H. *Abuse of Process – All Defendants.*

128.    Plaintiffs reallege and incorporate the allegations set forth above.

129.    The Defendants caused Plaintiffs to be served with various turnover orders and other orders regarding the disposition of Plaintiffs' property and rights.  The turnover order is a regular and properly issued process, made use of to assist a judgment creditor collecting judgments.  However, in this matter, the process was perverted and the process was used to compel the Plaintiffs to do things they were otherwise not obligated to do.  This improper use coerced Plaintiffs to surrender valuable property.  The turnover statutes were not intended for the use of allowing persons to obtain actual title to exempt property, and certainly not to seize third party property or affect third party rights who are not before the Court and who are not judgment debtors, but that is in fact the use to which the Defendants have put the turnover statutes they employed in this matter.  Plaintiffs have suffered significant irretrievable losses as a result of the abuse of process, for which Plaintiffs seek full recovery.

### I. *Restitution—The Shor Parties*

130.    Plaintiffs reallege and incorporate the allegations set forth above.

131.    The Shor Parties have wrongfully obtained Plaintiffs' assets and interests under turnover orders that were wrongfully entered, that constituted an abuse of discretion, and which have now been set aside and vacated by the Corpus Christi Court of Appeals by final, unappellable determination.

132.    The Shor Parties have thus obtained Plaintiffs' assets and interests, and caused damage thereto, which the Shor Parties were not lawfully entitled to, and thus must account to Plaintiffs in restitution for what they have taken, and the damage they have caused.

### J. *Wrongful Execution—Defendants*

133.    Plaintiffs reallege and incorporate the allegations set forth above.

47

134.    The Shor Parties have wrongfully obtained Plaintiffs' assets and interests under turnover orders that were wrongfully entered, that constituted an abuse of discretion, and which have now been set aside and vacated by the Corpus Christi Court of Appeals by final, unappealable determination.

135.    The Shor Parties have thus obtained Plaintiffs' assets and interests, and caused damage thereto, which the Shor Parties were not lawfully entitled to, and thus must account to Plaintiffs for wrongful execution for what they have taken, and the damage they have caused.

### K.   *Defendants are jointly and severally liable.*

136.    Plaintiffs reallege and incorporate the allegations set forth above.

137.    Each of the Defendants has operated as an instrumentality of the other.  Without limiting the generality of the foregoing Plaintiffs allege that each of the Defendants has worked together with common goals and common purposes to accomplish the matters hereinabove complained of.    Plaintiffs allege that each of the Defendants has participated in the aforementioned matters to accomplish the common goals set forth above.  Based thereon and for other reasons which Plaintiffs will demonstrate, all the Defendants are liable jointly and severally for all of the acts and obligations of the other.

### VII.
### JURY DEMAND

138.    Plaintiffs request a trial by jury.

### VIII.
### PRAYER

WHEREFORE, PLAINTIFFS request that the Defendants be cited to appear and answer, and respectfully requests that this Court award:

a.    Judgment against the Defendants for a sum of actual and compensatory damages to be proven in this litigation;

b.      Judgment against the Defendants for a sum to be requested at trial of this matter representing exemplary and/or punitive damages for his malicious, intentional and/or wrongful conduct;

c.      Costs and attorneys' fees;

d.      Prejudgment and post-judgment interest as provided by law;

e.      Such other and further relief to which Plaintiffs may be justly entitled.

Dated: August 12, 2013.

Respectfully submitted,

Gartner Law Firm, P.C.

/s/_____

Daniel D. Gartner
Federal Id. No. 2644
State Bar No. 07713650
Three Riverway, 18th Floor
Houston, TX 77056
(713) 621-7340
(713) 621-7771 (Fax)
dgartner@gartnerlaw.net

**ATTORNEY FOR PLAINTIFFS**